[Docket #34, 35]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

JOHANNE KANAUSS

    Plaintiff,

        v.

CITY OF BURLINGTON and ROSS
KOWNATSKY,

    Defendants.

---

1:19-cv-06474-RMB-JS

**OPINION**

APPEARANCES:

Mark J. Molz, Esq.
1400 Rte. 38 East
PO Box 577
Hainesport, New Jersey 08036
        Counsel for Plaintiff

Methfessel & Werbel, Esqs.
By:  Raina M. Pitts, Esq.
2025 Lincoln Highway, Suite 200
PO Box 3012
Edison, New Jersey 08188
        Counsel for Defendant City of Burlington

Chasan, Lamparello, Mallon & Cappuzzo, PC
By:  Drew D. Krause, Esq.
    John L. Shahdanian II, Esq.
    Mollie F. Hartman, Esq.
300 Lightning Way
Secaucus, New Jersey 07094
        Counsel for Defendant Ross Kownatsky

**BUMB, UNITED STATES DISTRICT JUDGE:**

Plaintiff Johanne Kanauss brings this employment sexual harassment suit against her coworker and alleged harasser, Defendant Ross Kownatsky, as well her employer, Defendant the City of Burlington.  Both Defendants move for summary judgment. For the reasons stated below, the Court will grant summary judgment on the federal claims and will decline to exercise supplemental jurisdiction over the remaining state law claims.

**I.   BACKGROUND**

Kanauss and Kownatsky are both employees of the City of Burlington, where Kanauss works as a Clerk and Kownatsky works as the City's Chief Code Enforcement Officer. (City of Burlington's Rule 56.1 Statement of Facts ("City's Facts"), Dkt. 34, at ¶¶ 4-5).  Kanauss alleges that she received a series of inappropriate text messages of a sexual nature from Kownatsky. (Kanauss's Complaint ("Complaint"), at ¶¶ 9, 11).  Kanauss further alleges that Kownatsky asked her to show him her breast in the office (Id. at ¶ 10), and, on a separate occasion, asked her to unbutton her blouse.  (Complaint, Dkt. 1, at ¶ 12).

The City maintains a zero-tolerance policy for workplace wrongdoing (City's Facts, Dkt. 34, at ¶ 3).  Upon being hired, Kanauss received an employee handbook and committed, via signature, to read the handbook and seek clarification from her supervisor or the business administrator if there was any policy

1

or provision in the handbook that she did not understand. (Id. at ¶¶ 6-7). Kanauss executed identical acknowledgments regarding receipt of the handbook in 2016 and 2017. (Id. at ¶ 8).

Section IX, A of the handbook reads, "General Prohibition of Harassment: The City will not tolerate and prohibits harassment of an employee by another employee, management representative, supplier, volunteer, or business invitee on the basis of actual or perceived sex, race, creed, color, religion, national origin and other protected characteristics." (Id. at ¶ 9) (internal quotation marks omitted). The City also maintains a specific policy against sexual harassment, which states:

> Prohibition of Sexual Harassment: The City of Burlington prohibits sexual harassment from occurring in the workplace or at any other location at which City sponsored activity takes place... Any employee who feels he/she has witnessed or been subject to harassment must immediately report the harassment to his/her supervisor or other appropriate personnel... If he or she feels uncomfortable addressing the situation with his/her supervisor or the supervisor is the subject of the complaint, the employee may report the harassment to the Department Director, the Business Administrator or the City Attorney. See the Employee Complaint Policy and Procedure for details... Notification by employee to appropriate personnel of any harassment problem is essential to the success of this policy and the City generally. The City cannot resolve a harassment problem unless it is reported. Therefore, it is the responsibility of all employees to bring those kinds of problems to the attention of management so that steps are necessary to correct them.

(Id. at ¶¶ 10-11) (internal citations, quotation marks, and
emphasis omitted).    Furthermore,   the   City's   Employee
Complaint Policy states, in part:

> Employees who observe actions they believe to constitute
> harassment, sexual harassment, or any other workplace
> wrongdoing should immediately report the matter to their
> supervisor, or, if they prefer, or do not think that the
> matter can be discussed with their supervisor, they
> should contact the Business Administrator... Employees
> should report incidents in writing using the Employee
> Complaint Form, but may make a verbal complaint at their
> discretion... All reports of harassment, sexual
> harassment, or other wrongdoing will be promptly
> investigated by a person who is not involved in the
> alleged harassment or wrongdoing.

(Id. at ¶ 12).  Kanauss acknowledged via a written and signed
questionnaire, provided by the City, that she read and
understood the City's policy against harassment.  (Id. at ¶ 19).
This questionnaire included a section to report incidents of
harassment, and Kanauss left this section blank on her November
2016 response.  (Id. at ¶¶ 23-24).

   Kanauss first reported Kownatsky's alleged misconduct to
her supervisor Howard Wilkins ("Wilkins") on December 29, 2016.
(Id. at ¶¶ 117, 122).  Kanauss contends that she informed
Wilkins of the entirety of Kownatsky's alleged conduct,
including alleged in-person wrongdoing, but Wilkins recalls
being informed only of inappropriate text messages.  (Id. at ¶¶
122-123). Wilkins informed Kanauss that he would discuss
Kanauss's allegations with City Business Administrator David

Ballard.  At the time, however, Ballard was out of the office due to oral surgery, so Wilkins reported the issue of inappropriate text messages to the City's Mayor.  (Id. at ¶¶ 125, 127-28).  According to Wilkins, the Mayor took Kanauss's complaint very seriously and said that he would reach out to Ballard.  (Id. at ¶ 129).  Later that same evening, Wilkins received a text from Ballard saying he wanted to speak to him about the complaint, and the two spoke the following day.  (Id. at ¶¶ 130-31).  During this conversation, Wilkins informed Ballard that there was "some inappropriate texting" between Kanauss and Kownatsky.  (Id. at ¶ 132).

After his conversation with Wilkins, Ballard spoke with Kanauss.  (Id. at ¶ 133).  Kanauss informed Ballard that Kownatsky had engaged inappropriate texting and that she wanted it to stop; she did not inform him of any other inappropriate conduct.  (Id. at ¶¶ 134-36).  Ballard then spoke to Kownatsky and informed him that "if he did it again, [Ballard] would fire him on the spot and have him escorted out of the building." (Id. at ¶ 140).  He also informed Kownatsky that there would be an investigation, and that Kownatsky was not to have any contact with Kanauss.  (Id. at ¶ 146).  Kanauss then had a second meeting with Ballard and Wilkins, during which she did not discuss any alleged improper conduct besides inappropriate texting.  (Id. at ¶ 148).

After the meeting, Ballard contacted the city's legal solicitor about Kanauss's complaint. (Id. at ¶ 155). Ballard recalled that the "[C]ity had to respond very strongly to this[,]" and that "[t]his is not what we would ever approve. We wanted to get to the bottom of it, we wanted to know all of the truth." (Id. at ¶ 156). The solicitor appointed an independent law firm, Hoagland, Longo, Moran, Dunst, & Doukas, LLP, to investigate Kanauss's complaint. (Id. at ¶ 157). About two weeks later, Kownatsky underwent two sessions of sexual harassment training and provided a written synopsis of these sessions to Ballard. (Id. at ¶¶ 186-87).

Throughout January and February 2017, Hoagland-Longo attorney Jennifer Passannante conducted the investigation into Kanauss's complaint. (Id. at ¶ 206). As part of this investigation, Passannante interviewed Kanauss, Wilkins, Kownatsky, and Ballard, and she reviewed various text messages, emails, and related documents. (Id. at ¶¶ 206-08). The firm then issued its report on March 7, 2017. (Id. at ¶ 208). Passannante's report recommended that the City adopt the following actions:

> i. Both Kanauss and Kownatsky be advised that, the investigation having concluded, they are to continue to have no contact via phone, text, email, social media, or otherwise at work or for personal matters, except as provided herein;

ii. Kownatsky is to avoid any direct contact or communication with Kanauss at work;

iii. If Kownatsky is required to contact Kanauss directly for a work-related matter only, he may do so via email on which Wilkins must be carbon copied;

iv. Kownatsky should continue to walk around, as opposed to walking through Kanauss's office, to avoid unnecessary interaction. This arrangement can be reconsidered in the future and, only with Kanauss's consent, altered to allow Kownatsky to pass through;

v. The Summary of Counseling dated January 4, 2017 and Memorandum, of January 5, 2017 be recorded as a Written Counseling in Kownatsky's personnel file;

vi. Kanauss should receive training regarding MC Systems that is comparable to the training of other employees in the Construction Office and/or as necessary to fulfill her job requirements;

vii. Ballard and any other City employee(s) designated to perform investigations into allegations of unlawful harassment, discrimination, and/or retaliation should receive training with regard to complains [sic] of unlawful harassment, discrimination, and retaliation and conducting investigations regarding same;

viii. Employees should be advised as to where they may access the Employee Complaint Form referenced in the Employee Handbook or, if a Form is not utilized by the City, reference to it should be removed from the Handbook.

(Id. at ¶ 238) (internal citations omitted). The City adopted each of these recommendations. (Id. at ¶ 239).

Several months later, on a complaint form dated August 28th, 2017, Kanauss alleged that in June 2017, "[Kownatsky] always walks up to the building or comes out of the building while I am there talking to Howard and Justin and jumps into our

conversations. I am the one who leaves." (Id. at ¶ 274).
Kanauss then submitted another complaint form detailing similar
allegations in July 2017.  (Id. at ¶ 275).  Shortly after filing
these complaints, Kanauss met with Passannante to discuss these
new allegations and Ballard also conducted his own
investigation.  (Id. at ¶¶ 285-86). On October 25th, 2017
Ballard informed Kanauss that he had concluded his
investigation, and informed her that "the City determined that
it was appropriate to clarify or revise the previous directives
given."  (Id. at ¶¶ 297-98). Accordingly, Ballard implemented
the following additional directives:

> i. Mr. Kownatsky has agreed not to enter the building at
> the side entrance, but will instead utilize the front
> entrance on days when Ms. Kanauss is at work;
>
> ii. Mr. Kownatsky has agreed that if he takes a break
> outside the building, he will not use the side entry
> area for such breaks, but will utilize the front entrance
> area:
>
> iii. If Mr. Kownatsky is required to contact Ms. Kanauss
> for work, it is to be through email with either Mr.
> Wilkins, Mr. Harris or myself copied on the email;
>
> iv. At your request, there is to be no contact between
> Ms. Kanauss and Mr. Kownatsky, including that Mr.
> Kownatsky will not offer any greeting to Ms. Kanauss,
> even if other employees are present;
>
> v. Mr. Kownatsky will not interrupt any conversation or
> attempt to speak to anyone with whom Ms. Kanauss is in
> conversation, with the exception being any professional
> or work related meeting pertinent to the performance of
> his job title; and

vi. Consistent with Ms. Kanauss' request, there is to be no contact between she and Ms. Kownatsky, meaning that both parties are not to have any contact by phone, email, text, or in person or through social media, including through Facebook, Linked In, Twitter or similar social media sites.

(Id. at ¶ 299) (internal quotation marks omitted).

In early 2019, Kanauss filed the instant lawsuit in New Jersey State Court. (See Complaint, Dkt. 1, at ¶ 1).  Kanauss asserted claims arising under Title VII of the Federal Civil Rights Act of 1964 and the New Jersey Law Against Discrimination, NJDA 10:5-12 (NJLAD), as well as state tort claims. (Id. at ¶¶ 43-63).  Defendants removed this action to federal court, and now seek summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if it might impact the "outcome of the suit under the governing law."  Gonzalez v. Sec'y of Dept of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012).  A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party.  Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of

the nonmoving party.  Melrose, Inc. v. City of Pittsburgh, 613
F.3d 380, 387 (3d Cir. 2010).  However, a mere "scintilla of
evidence," without more, will not give rise to a genuine dispute
for trial.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).  Moreover, a court need not adopt the version of facts
asserted by the nonmoving party if those facts are "utterly
discredited by the record [so] that no reasonable jury" could
believe them.  Scott v. Harris, 550 U.S. 372, 380 (2007).  In
the face of such evidence, summary judgment is still appropriate
"where the record taken as a whole could not lead a rational
trier of fact to find for the nonmoving party."  Walsh v.
Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

    The movant has the initial burden of showing through the
pleadings, depositions, answers to interrogatories, admissions
on file, and any affidavits "that the non-movant has failed to
establish one or more essential elements of its case."
Connection Training Servs. v. City of Phila., 358 F. App'x 315,
318 (3d Cir. 2009).  "If the moving party meets its burden, the
burden then shifts to the non-movant to establish that summary
judgment is inappropriate."  Id.  In the face of a properly
supported motion for summary judgment, the nonmovant's burden is
rigorous: she "must point to concrete evidence in the record";
mere allegations, conclusions, conjecture, and speculation will
not defeat summary judgment.  Orsatti v. New Jersey State

Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v.

Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v.

Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)

("[S]peculation and conjecture may not defeat summary

judgment.").  However, "the court need only determine if the

nonmoving party can produce admissible evidence regarding a

disputed issue of material fact at trial"; the evidence does not

need to be in admissible form at the time of summary judgment.

FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

**III. ANALYSIS**

    **A.   Title VII Claim Against Defendant Kownatsky**

    Kanauss asserts both hostile work environment and quid pro

quo sexual harassment theories of liability against Kownatsky.

Both theories fail as a matter of law.

    Individual liability is not permitted under Title VII.

Sheridan v. E.I. Dupont Nemours & Co., 100 F.3d 1061, 1078 (3d

Cir. 1996).  Indeed, the Third Circuit has "clearly foreclosed

any possibility of individual liability under Title VII."

Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 432

(D.N.J., 2003) (citing Sheridan, 100 F.3d at 1078).  In

foreclosing individual liability, the law within the Third

Circuit is "settled" and "dispositive".  Id. (citing Mosley v.

Bay Ship Management, Inc., 174 F. Supp.2d 192, 199-200 (D.N.J.

2000)) (internal quotation marks omitted).

The parties agree that Kownatsky was not Kanauss's employer.  Moreover, Kanauss admitted that Kownatsky has been sued only in his individual capacity, that Kanauss's employer was the City, and that Kownatsky did not have any supervisory authority over her. (City's Facts, Dkt. 34, at ¶¶ 3-4, 8). Accordingly, because there is no genuine dispute of material fact and Kownatsky is entitled to judgment as a matter of law, the Court grants Kownatsky's Motion for Summary Judgment as to the Title VII claims against him.

**B.   Title VII Claims Against Defendant City of Burlington**

**1.   Quid Pro Quo Sexual Harassment**

Kanauss seeks to hold the City liable for her coworker's alleged quid pro quo sexual harassment.  The Third Circuit has defined quid pro quo sexual harassment as

> [U]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature [where] (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

Bonenberger v. Plymouth Twp., 132 F.3d 20, 27 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997) (abrogated on unrelated grounds)).

Here, the City has met its burden by showing that Kanauss has failed to provide any evidence (1) that Kownatsky ever

11

explicitly or implicitly conditioned Kanauss's employment or job status on the existence of a romantic or sexual relationship, or (2) that the rejection of such a relationship was used as a basis for any employment decisions concerning Kanauss. (City's Brief, Dkt. 34, at 35-36).  Indeed, Kanauss has failed to point to any evidence indicating a genuine issue for trial, and did not address this claim in her brief. (See generally Kanauss's Brief, Dkt. 45).  In addition, the undisputed record demonstrates that, during the relevant time period, Kanauss was promoted; she obtained an enhanced title and an increase in pay, with no additional work responsibilities. (Deposition of Kanauss, Dkt. 45, at 15; ¶¶ 7-25, 16; ¶¶ 1-4).  Under these circumstances, the City has met its burden. Accordingly, the City's Motion for Summary Judgment is granted as to Kanauss' quid pro quo sexual harassment claim.

### 2.  Hostile Work Environment

Under Title VII, "an employer may not 'discharge. . . or. . . discriminate against any individual with respect to. . . compensation, terms, conditions, or privileges of employment because of such individual's. . . sex[.]'" Huston v. P&G Paper Prods. Corp., 568 F.3d 100, 104 (3d. Cir 2009) (quoting 42 U.S.C.§ 2000e-2(a)(1)).  To sustain a hostile work environment claim, a plaintiff must prove:

12

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the desistence of *respondeat superior* liability.

Id. (citing Weston v. Pennsylvania, 251 F.3d 420, 426 (3d. Cir 2001)).  The first four elements exist to determine whether a hostile work environment existed, the fifth exists to determine whether an employer can be held liable.  Id.  More specifically, an employer's liability depends, in part, on whether the employee who allegedly created a hostile work environment was a supervisor or coworker.  Id.  When a hostile work environment is "created by a victim's non-supervisory coworkers, the employer is not automatically liable."  Id.  Instead, an employer is liable for such harassment only if (1) "the employer failed to provide a reasonable avenue for complaint[,]" or (2) "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  Id. at 104-05.

Here, Kanauss concedes that Kownatsky did not have any supervisory authority over her.  (Kownatsky's Rule 56.1 Statement of Facts ("Kownatsky's Facts"), Dkt. 35, at ¶ 8).  Therefore, the City cannot be strictly liable for Kownatsky's alleged harassment, and the Court will instead review this claim under the co-worker liability framework.

### *Reasonable Avenue for Complaint*

The City contends that it afforded Kanauss a reasonable avenue for complaint.  (City's brief, Dkt. 34, at 24).  Although Kanauss's brief does not address any of the Title VII claims, Kanauss argues-- in the context of NJLAD-- that she was not provided a reasonable avenue for complaint, principally relying on the fact that her employee handbook did not contain a complaint form (Kanauss's Brief, Dkt, 45, at 6-7).

As the plaintiff, Kanauss has the burden of establishing that the City failed to provide a reasonable avenue for complaint.  See Weston, 251 F.3d at 427 ("[W]hen the source of the alleged harassment is a co-worker, a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint.").  Although the issue of reasonableness is a question for the jury, some courts have held that when "an employer has promulgated a sexual harassment policy and informs all employees of its contents, such procedures will generally be deemed adequate, so long as employees are capable of invoking the process to enforce the policy."  Wahlstrom v. Metro-N. Commuter R. Co., 89 F. Supp. 2d 506, 523 (S.D.N.Y. 2000); see also Donaldson v. Ronald Lensbouer & Somerset Cty., No. CV 15-63, 2017 WL 2199006, at *10 (W.D. Pa. May 18, 2017) (same).

As noted above, Kanauss contends that a complaint form was not included in the employee handbook, despite a policy that it

should have been included. (Kanauss's Brief, Dkt. 45, at 10).
But the Court is unpersuaded by Kanauss's argument.  At the
outset, this is a test of reasonableness, not a test of
perfection.  Even if the City provided no form whatsoever,
Kanauss was still afforded the opportunity to report sexual
harassment verbally or via questionnaire-- two avenues that
Kanauss does not address in her brief.  (See generally id.).
Moreover, a form is not wholly unavailable simply because it was
omitted from the handbook. The City also identified three
additional people to whom a complaint could be reported if an
employee felt uncomfortable reporting an incident to their
supervisor or if their supervisor was the subject of the
complaint-- namely the Department Director, the Business
Administrator, and the City Attorney.  (City Facts, Dkt. 34, at
¶ 11).  Finally, the City periodically reminded employees of
relevant policies and the available reporting options.  (Id. at
¶ 18).

     Given the availability of alternate methods for reporting
sexual harassment and the absence of any efforts from the City
to affirmatively block a complaint or access to filing a
complaint, the Court is unpersuaded that the absence of such a
form from the handbook rendered the avenue of complaint
available to Kanauss unreasonable.  Similarly, Kanauss has not
challenged the availability or sufficiency of the City's other

reporting methods.  Accordingly, this Court concludes that the
City afforded Kanauss a reasonable avenue of complaint.

### *Prompt and Appropriate Remedial Action*

As noted above, an employer is liable to the employee for
the sexual harassment of a co-worker if "the employer knew or
should have known of the harassment and failed to take prompt
and appropriate remedial action." Huston, 568 F.3d at 104.  The
City argues that it took prompt and appropriate action upon
learning of Kownatsky's alleged conduct towards Kanauss. (City's
Reply Brief, Dkt. 48, at 7).  Kanauss's Brief, however, does not
address the Title VII claims, and she instead challenges the
City's action on two grounds in the context of the NJLAD claim.
See Kanauss's brief, Dkt. 45).  First, she argues that the
Hoagland-Longo investigation was not thorough and independent.
(Id. at 8-9). Second, Kanauss argues that the City did not take
disciplinary action against Kownatsky. (Id.).

As a matter of law, a plaintiff cannot prove that her
employer failed to take prompt and appropriate remedial action
solely because of an insufficient investigation. Knabe v. Boury
Corp., 114 F.3d 407, 412 (3d Cir. 1997).  In Knabe, the Third
Circuit held that "[e]ven if a company's investigation into
complaints of sexual harassment is lacking, the employer cannot
be held liable . . . unless the remedial action taken subsequent
to the investigation is also lacking." Id.  Moreover, the Court

explained that an employer is not required to take "punitive action against the harassing employee," as long as the remedial actions it does take are "reasonably calculated to prevent further harassment." Id. (internal citations omitted). Stated differently, remedial action that does not stop the alleged harassment is still adequate if that action is reasonably calculated stop the harassment. Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007). As a result, the Court in Knabe held that an employer took appropriate remedial actions, as a matter of law, by warning the harassing-employee of the consequences of further harassment, and by providing the harassed-employee with the phone numbers of four people who could be contacted in the event of future harassment. Knabe, 114 F.3d at 413.

Here, Kanauss contends that the Hoagland-Longo investigation was insufficient because she was given "no notice" of her interview before it occurred. (Kanauss's Brief, Dkt. 45, at 11). Similarly, Kanauss argues that the city failed to take appropriate remedial action because "Kownatsky was never disciplined for his egregious actions." (Id.). Both arguments fail as a matter of law.

The Court finds that the City's actions were sufficiently similar to those considered in Knabe, and it reaches the same conclusion as to their adequacy. When Kanauss initially met with Wilkins, Wilkins addressed Kanauss's complaints promptly;

17

although he was unable to speak with Ballard-- who was out of the office due to oral surgery-- he spoke to the Mayor, who then spoke with Ballard that evening. (City Facts, Dkt. 34, at ¶¶ 125, 127-28).  The following day, Ballard spoke with both Kanauss and with the city solicitor, who moved quickly to initiate an investigation.  (Id. at ¶ 155).  This investigation began immediately and was completed in less than three months with measures in place to prevent interaction.  (Id. at ¶¶ 206, 208).  Ballard informed Kownatsky of the unacceptability of sexual harassment, and that future sexual harassment would result in him being fired on the spot and escorted out of the building.  (Id. at ¶ 140).  The City likewise required Kownatsky to undergo multiple sessions of sexual harassment training, adopted all of the recommendations suggested by the independent investigator, and promptly responded when Kanauss alleged that Kownatsky was not conforming with those requirements.  (Id. at ¶¶ 186, 238-39, 299).

Under Knabe, these remedial actions were reasonably calculated to stop the alleged harassment as a matter of law and are therefore appropriate.  In addition, the Court finds that these actions were sufficiently prompt; the remedial actions began within a day of Kanauss's initial complaint, and an independent investigation was completed, and its recommendations implemented, in less than three months.  Moreover, Kownatsky

underwent sexual harassment training less than two weeks after the initial allegations.  In short, the City has identified numerous steps that it took to respond quickly, and Kanauss has not meaningfully challenged the City's promptness.  Accordingly, the Court concludes that the City's actions were prompt and appropriate as a matter of law.

Having found that the City's remedial actions were reasonably calculated to prevent further harassment, Kanauss cannot establish that the City failed to take appropriate actions due to an inadequate investigation.  See Knabe, 114 F.3d at 412.  Nevertheless, the Court notes that Kanauss's primary argument-- that the investigators gave her no notice before the interview-- is lacking.  Kanauss contends that she "was advised that she would be interviewed the afternoon before the interview took place.  [Kanauss] had been traumatized by the behavior of Kownatsky and re-victimized when she was interviewed upon no notice." (Kanauss's Brief, Dkt. 45, at 9).  Although the Court does not dispute the trauma that Kanauss may have experienced, Kanauss has not explained how this trauma may have compromised her testimony, how this amount of notice was insufficient, or how much notice was necessary.

Finally, Kanauss has advanced no arguments that the City should have known about Kownatsky's alleged wrongdoing prior to December 29th, 2016 or taken any remedial action prior to this

date.  (See id.).   Indeed, Kanauss gave the City no reason to
suspect Kownatsky of wrongdoing, as she declined to report any
inappropriate behavior when completing the City's Policy Against
Harassment questionnaire just one month before initially
reporting Kownatsky's behavior. (City's Facts, Dkt. 34, at ¶
24).   Thus, the Court grants the City's Motion for Summary
Judgment as to Kanauss' hostile work environment Title VII
claim.

### C.   Remaining State Law Claims

The Court "may decline to exercise supplemental
jurisdiction . . . if . . . the district court has dismissed all
claims over which it has original jurisdiction."  28 U.S.C. §
1367(c)(3).  In addition, the Court "'must decline' to exercise
supplemental jurisdiction in such circumstances 'unless
considerations of judicial economy, convenience, and fairness to
the parties provide an affirmative justification for doing so.'"
Stone v. Martin, 720 F. App'x 132, 136 (3d Cir. 2017) (quoting
Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000)).

Here, the Court has federal question subject matter
jurisdiction over the Title VII claims and supplemental
jurisdiction over the other state law claims.  The parties are
not diverse, and the Title VII claims are the only questions of
federal law presently before the Court.  Thus, because there is
no final pre-trail order in this case, the Court has no

affirmative justification for retaining supplemental jurisdiction.  Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, and hereby remands this case to New Jersey state court.

**IV. CONCLUSION**

    For the above-stated reasons, the Court grants Defendants' Motions for Summary Judgment as to the Title VII claims, and will decline to exercise supplemental jurisdiction over the remaining state law claims.  An appropriate Order accompanies this Opinion.


September 28, 2020                __s/ Renée Marie Bumb _____
                                     RENÉE MARIE BUMB
                                     UNITED STATES DISTRICT JUDGE